Appeal 16-2065 and Cross Appeal 17-1429, Ensana Oil and Gas USA Inc v. Zaremba Family Farms Inc at all or arguments not to exceed 15 minutes per side. Mr. Robert J. Ruranga for the Appellant Cross Appellee. Good morning, Your Honors. I'm Bob Ruranga on behalf of Encana. We are the Appellant in 16-2065 and the Cross Appellee in 17-1429. I'm reserving eight minutes of my time for rebuttal primarily, but presumably to address 17-1429, but we'll see. And I'd like to start with Encana's appeal in 16-1265. This is an appeal of the judgment that the district court entered on Encana's breach of contract claim. The sole basis for that judgment was the Zaremba's waiver defense, which was submitted to the jury without any proof of consideration associated with that alleged waiver or that any proof of what we regard as a sufficient signed writing that could substitute for consideration. And I think the primary issue for this court on appeal is whether the district court committed a legal error when it allowed the defense to go to the jury without sufficient proof of consideration or assigned writing. As we explained in our papers, we think this was clear error by the district court because Michigan law first announced in a Supreme Court decision called Babcock, followed by several subsequent Michigan Court of Appeal decisions and decisions of federal court applying Michigan law, and finally memorialized in the Michigan Standard Form jury instructions. How do you deal with McCarty, which they just provided a site for? We would first object to its consideration given that it's a case from 1964 that wasn't provided until two days before argument. But it's still the Supreme Court. Let's just assume the three of us are going to go find it. Fair enough. We think it's irrelevant to the issue that was before the district court and this court. As we read McCarty, what was really being considered there was the question of whether a written contract that had allegedly been modified via an oral agreement could then have the oral modification enforced. The court said that if the parties continued to perform the contract after the modification, that's sufficient consideration because they must, they were obviously benefiting from the continued contractual relationship and that continued performance, that continued benefit itself. Was the continued performance in accord with the modification or was it continued performance in accord with the original contract? I believe it was continued performance in accord with both. And to the extent there's a modification, it was the modification. That's how we read the opinion. And that really is not the issue here. That's not the facts presented here. I mean, the fact pattern here is Encana had a right to recovery of $1.8 million. There was a phone call between an Encana employee and a Zaremba employee where she said the good news is you get to keep it. That was then later retracted by Encana. There's no consideration that the Zarembas ever gave Encana. There's no signed writing memorializing Encana hereby waives its right to recover that money signed by Encana. Nothing like that. And the Babcock case and other cases specifically say when there is an allegation that a right has been relinquished or released, that has to be supported by consideration. If we agree with you on the law, am I correct that the Zarembas have offered no, and I'll ask them this, evidence of consideration or is there any evidence? No, there is none, and I believe it's undisputed that there is no consideration. I also believe there's no significant dispute over whether this was a substantial right, because the Babcock case in the form during instruction says waiver of a substantial right requires consideration. And as we explained in our papers, this was clearly a substantial right. It was virtually Encana's only right under the contract to get this money back. What about their, just deal with arguments briefly on the tax form and the email about the $2 million, losing the $2 million. So the Michigan statute, MCL 566.1 that says a writing can sometimes substitute for consideration, that says and has been interpreted by Michigan courts to require that the agreement be in the writing. So I think in this case Encana would have had to say we hereby waive our right to get this money or you don't have to pay the money back, something like that. There's nothing like that here. Obviously the 1099 form says nothing at all about the Zaremba's legal obligations to return the money. But why would you file a 1099? Because at that point in time Encana had paid the Zaremba's $2 million. They had the money for six months at that time. They had not returned it. The only truthful thing that Encana could have said to the IRS at that time was we paid them $2 million in 2010, which was true. That's why the 1099 went out. The other shortcoming of the 1099 is that it's not signed by Encana. And the Michigan statute says very clearly the writing has to be signed against the party against whom it's being enforced. What about the email chain? The email chain is internal to Encana. It was never sent to the Zaremba's. It was an email chain from July 14, which is actually before the alleged waiver happened. And, of course, it's an email chain. It wasn't signed by anyone. We think it's clearly insufficient. Turning to their cross appeal, unless you have any more questions on our appeal. On the antitrust claim, the grant of summary judgment we think was clearly appropriate. This court's precedent has made it very clear that in order for a Section 1 conspiracy claim to survive summary judgment, the evidence has to tend to exclude the possibility that the alleged conspirators were acting independently when they engaged in the conduct that supposedly gave rise to the claim. There's a lot of evidence with all of these emails and communications and everything else. Why shouldn't that go to the jury for the jury to figure it out when there's evidence going both ways? Because the emails that were exchanged between Encana and Chesapeake were exchanged in May and June of 2010. And at the same time those emails were exchanged, Encana and Chesapeake were undisputedly engaged in price competition for the Zaremba's acreage. At the same time all of those emails are being exchanged about the possible joint venture, Encana and Chesapeake are driving up each other's prices by over $1,000 each in both cases. This is affirmative evidence of competition. Moreover, there was a point in those email chains on June 25th, and we discussed this in our third brief, where someone at Chesapeake actually said, hey, because we're in these joint venture negotiations, why don't we stand down on some of the private landowners that we're currently bidding each other up on. Internal emails on both Encana and Chesapeake's side agree that that proposal was rejected. And moreover, later that day, both companies increased their prices in response to the Zaremba's saying, you know what, Encana, Chesapeake is out, bid you. What about the evidence that on June 29th, the day the deal fell apart with Chesapeake, there was a phone call between the two companies, and then Encana comes in and gets the deal? So the Zaremba's theory there is that in that phone call, there was some kind of agreement that Chesapeake would back out and Encana would come in. There's no evidence for any of that, in fact, at first. But why couldn't the jury conclude, just assuming this could go to the jury, why couldn't they conclude from the combination of what occurred plus the phone call that something was said? Is that improper speculation? It is improper speculation, Your Honor, because at that point in time Chesapeake itself did not withdraw from the negotiations. What happened on June 29th is the Zaremba's became frustrated with the fact that Chesapeake had asked the Zaremba's to bear a portion of post-production costs. Chesapeake had sent the Zaremba's that proposal on June 26th, two days before the phone call. We have internal and rebutted emails from Chesapeake that on June 28th, the day before the phone call, Chesapeake was talking internally about asking the Zaremba's to bear post-production costs. In fact, Chesapeake's CEO instructed their land agent during the June 29th negotiation between Chesapeake and Zaremba to argue on post-production costs. So there's utterly no evidence that Chesapeake changed its position in response to that phone call. The other critically inconsistent fact there is that on June 29th, Encana reengaged with the competition. On the morning of June 29th, Encana did not have an offer out to the Zaremba's. Their last offer had expired on the 25th. What happened on the 29th was the Zaremba's became frustrated with Chesapeake, left the negotiations, called Encana, asked Encana to put its offer back on the table, and Encana agreed. And when it agreed, it did not do anything that was paralleling what Chesapeake was doing. Encana's offer had Encana bearing post-production costs. Encana's offer had the increased dollar per acre, $2,900, that it had offered only because of competition with Chesapeake. Your red light has been on for quite a while. Yeah, sorry. I'll stop there. You were not catching your breath, and I assumed you were answering Judge Sipar. So we'll let you have your rebuttal. Michael Weiss representing the Zaremba parties. If it pleases the court, I think we've asked for three minutes of rebuttal since the majority of their time was going to be responding to ours. Sure. This antitrust claim never should have been dismissed. Every answer to your questions simply creates a question of fact. Every time he tells you, well, this is this, it's just a question of fact. That's all it is. When I go through the e-mails and everything else, where is the affirmative evidence of agreement? Because he is right, right, that there is evidence that they were bidding each other up, that they didn't have an agreement. I can't remember the specifics of it, but at one point, Chesapeake basically said, forget about them. They're the competition. We're going to shaft them. Affirmative evidence of agreement is, first of all, on June 15th, there's an e-mail saying we appear to have agreed. That in and of itself is direct evidence according to the opinions that we cited. But we know after that. So they said, the incantant president says to its CEO, appeared to have agreed to a division of work for fee leasing in Michigan with Chesapeake and are currently working a letter of intent. That's what they said. Right? That's not, a letter of intent, as we both know, is not an agreement, even if you get to a letter of intent. Right. And then they continue. And on June 29th, the critical fact that Mr. Waringa ignores is, every single person on that call took the Fifth Amendment as to what happened on June 29th. But I thought they later, correct me if I'm wrong, they later recanted it in declarations. No, you are wrong. I am? Mr. Jacobson never recanted. Mr. Jacobson's the one from Chesapeake, and he never recanted. He still took the Fifth Amendment. Mr. Dox, John Sharp did recant, but that just creates a question of fact as to when he was telling the truth. You know, you first take the Fifth Amendment saying this is going to incriminate me. No, you've got to have affirmative evidence. We don't. It is. When you retract saying that now I'm going to tell you that nothing happened, that is a question of fact. And the fact that Jacobson still refuses to testify about what happened on June 29th. And one other thing that's being totally ignored. Hold on. I'm sorry to interrupt you. Was Jacobson Chesapeake's? Correct. And he was on the phone with Sharp at the same time. One important fact that's being ignored, I think, to completely answer your question, is then everything that happened afterwards. They had planned to divide it up. I guess on July 15th they both go to zero and prices drop by 50 percent. Exactly what they planned. Then in October, less than four months later, exactly what they planned. They don't bid against each other. And in May, every single piece of property was bid against each other. Can I ask you, so let's assume between July and October that they have an agreement. Is there any evidence on the record that your clients, the Zarembas, went out on the open market and tried to lease on the open market during that period? We weren't trying to lease. We were trying to sell. Or sell. I'm sorry. We never tried to lease. And nobody would buy it. And here's why. Wait. No, no. You're not answering my question. Is there any evidence in the record that your client went out onto the open market and tried to sell? Yes. We called up both Chesapeake and Encana, and there's evidence that Mr. Zaremba testified that he asked both of them if they're interested. Where in his testimony is that about that period? I don't know the exact page, but he testified that he went out to each of the parties. And Steve Gerver also testified that he called people, seeing if they were interested, and nobody was interested. The market really was Chesapeake and Encana. They had bought 90% of the property. I understand that. They are the market. Wait. This is an important point. I just want to understand it. Between July and October, you're saying in their deposition testimony, if I go read it. Trial testimony. Trial testimony. I'm sorry. They testified that during this period they were out on the open market. They had talked to Chesapeake and Encana, and Mr. Gerver tried to talk to other people, and nobody was interested. Was there any evidence presented at summary judgment, though? Yes. The same evidence was presented at summary judgment. By deposition testimony? I believe so. I'm not positive if it was deposition testimony or if it was by affidavit. I'm not sure that's necessarily the critical point because when the price goes down for the state land, which is contiguous to the Zaremba land, when the price goes from $3,000 to $50, no one's going to buy their property for any more than $50 an acre. So the fact of the price going down, and the exact same, it's kind of the case that you had, Judge Moore. Can I go back to Judge Bush's question because I think it's important? So is there testimony, because on these claims, summary judgment was granted. Correct. Is there testimony pre the summary judgment in depositions that they went out on the open market and sought to sell? Honestly, I can't tell you if it was on summary disposition. It wasn't an issue that anybody raised at summary disposition, so I'm not sure that was in the briefs. It did come out at trial. That's all I can tell you for sure. Okay, but trial is post-grant. I understand that. I was telling you I don't think that was an issue that Canada raised at summary disposition, and therefore we didn't respond to it. I think it was there. I know what happened at trial. That's all I can tell you. Okay, go ahead. I'm sorry. With all candor. But October is important. In the case that you had, Judge Moore, evidence of it actually happening is proof. What they said, they tried to cover it up, and that's another thing, too. You have two separate times they tried to cover it up, first by the Fifth Amendment, and then by an email saying, or a conversation, another conversation between Jacobson and Schock where they say, let's make it look, quote, competitive. Well, if they didn't have an agreement, you don't have to make it look, quote, competitive. You don't have to make it look not sliced and diced if there wasn't an agreement. The only reason it would not be sliced and diced is if there was an agreement, and there was one, and they acted in conformance. The jury has to make one and only one assumption in this case, one inference. They have to say, based upon all the evidence, that what they planned to do, what would save them billions, what they took the Fifth Amendment to refuse to talk about, what their attorneys said don't put in writing, what they tried to hide by making it look not sliced and diced, that everything that they said they would do, actually it did happen in October. Everything happened as they planned it. It's kind of like you plan the perfect murder, and the person dies the exact same way that it's planned, and you say, we didn't do it. Yeah, you did, and it's certainly enough to get to a jury. What about their argument that the reason prices were going down is they found out there really was no there there? There was nothing that happened between June 29th and Chesapeake's at $63 million. Suddenly they don't want it, so now we're forced to take $7 million less because presumably that's what happened during the phone call. And then between that date and July 15th, nothing changed, and they both go to zero, and they drop prices by 50%. You were forced to take $7 million less, but didn't have to pay the production costs within Canada. That's true, and that wouldn't have been that, but still, it wouldn't have been $7 million. And we would have went back and taken it if we knew they were lying, which goes to the fraud claim, and should have had, obviously, antitrust evidence that would have helped support it, and Mr. Norris never should have been allowed to testify. You only have 28 separate objections, five stern warnings, five things being stricken. They knew what they were doing. These are two 40-year attorneys, Mr. Kirtner asking the questions, and Mr. Norris answering them. It's just wrong. You don't do that, and it tainted the trial. He was doing things he shouldn't have done, but to go back to the question as to, you know, back in the prices because of other things, as the judge correctly noted, and as the law correctly notes, that's just a question of fact as to really was that the reason. Judge Maloney noticed that when he said Dr. Kneipper could testify. He says, whether or not the prices dropped because there's more land or because of whatever excuse they want to use, that's just a question of fact, and here's the biggest reason why it's a question of fact. If you read the July 15th letter, when they tell Sorembra you shot in the head, two important things. One, they don't ask for the money back. Why? Because they already said that you can keep it. That July 15th letter doesn't ask, but the biggest important thing about July 15th is they say they didn't. They terminated us because they had a board meeting. So contemporaneously, they write down board meeting. We deposed Mr. Marsh, and Mr. Marsh admitted there never was a board meeting. The excuse that Mr. Moringa in Canada tries to get up with now saying there was more land, or we found out the well results, the well results were well after. Any of those excuses, why did the letter say it was a board meeting and it didn't exist? When were the well results? The initial well results were all before the prices went up before May, and they went crazy. The well results after July 15th were sometime at the end of July, beginning of August, before they shot us. There were no well results. There was no well result other than the initial one that caused it to spike prior to shooting us in the head. None. Prior to dropping prices 50%. None. So the fact that you keep on, that you continue to find excuses that differ from the excuse you originally used is a question of how can you, how many times can you try to get out of it? You give one excuse and say, oh, shoot, that one doesn't work. Let me come up with another one. Oh, well, that doesn't work. The well results again because they showed there weren't any. Well, the fifth, we actually put it in our briefs. The fifth time they came up with an answer, it was, oh, we found out there was more land to be offered in October. The October land sale was, they have this land sale every May, every October. There's nothing new about that. But that's the excuse. An excuse becomes a question of fact. The jury doesn't have to believe the excuse. Their brief is a trial brief. It's really a trial brief for the closing argument. It's not whether it should have went to the jury. This should have went to the jury. And if the jury heard all the evidence on antitrust, it would have further supported the fraud and Do you want to deal with the waiver issue? Sure, I'd love to. Let me, with respect to waiver, first of all, the last What about Babcock? First of all, as Judge Maloney says, Babcock is dicta when it talks about that you need consideration. There's plenty of other I mean, the facts seem identical. No, because in Babcock, what they first say is that your letter doesn't work anyway. So if your letter isn't a waiver, it doesn't matter whether you have consideration. So the first part is, do you have any proof? Then they say, and even if you had any proof, which you don't, you need consideration. So it becomes dicta because you first didn't even have any evidence. That's what they said, and that's why it's dicta. But there's plenty of Michigan cases indicating you don't need consideration. We cited you to one, and there's plenty that Judge Maloney Wait, wait, wait. So McCarty is a modification case. Babcock's a waiver case. The Michigan pattern instruction says you need consideration. There's court of appeals cases following that. You don't deal with any of them in your briefs. So give me a quick minute on why we shouldn't find that consideration is required. And even Williston, which Maloney cites, says later that there's a significant minority of states, including, it seems to me, Michigan, that require consideration. One, I think there's also cases saying that you don't require consideration. Give me your best case from Michigan that says you don't need consideration for a waiver. Waiver modification is really the same thing. Okay, but give me your best case that you don't need consideration for a waiver. And we talk about Fitzgerald in our brief as well. And the statute, MCL 566.01, says for modification, which is just really what it is, is what they're arguing, you don't need consideration. Because the statute of frauds is why they get to the writing, and the statute of frauds says you don't need consideration. That says it. And we did have consideration. We didn't sue them for two years. They never asked for the money for two years. What was your consideration? We never sued them. The failure to sue is the consideration. They wanted everything to die down. On July 20th, we wrote them saying, hey, you stole our money. And they're saying, no, don't worry about it. You can keep the money. Don't worry. And they never, ever, ever asked for it. They 1099-ed us, which is proof. If it's a deposit, you don't 1099 a deposit. That's proof. They never asked for it back. They never revoked it. They never revoked the 1099, even today. Your consideration in answer to Judge Moore's question is failure to sue. That's part of it. And it also let everything die down. Because they didn't want lawsuits right then. They wanted to be able to evaluate the market, see what happens, give us time to decide what to do. If you read the letters back and forth, maybe we'll settle. Let's see what's going on. Let everything die down. But letting everything die down is not consideration. So failure to sue is what you're arguing. That is one. And they offered it. We said fine. You can keep the money. They gave up the right. Saying fine is in consideration. They thought it benefited them to do what they did. Since they thought it benefited them to make that offer, we responded. If they didn't think it would benefit them, why did they do it? Why did their internal email say they gave it up? It's not just the internal emails. It's not just the writing. She said it and the 1099 never revoking it. I'll stop it. Thank you. Yes. To start where you just ended, two factual points. In Canada did request the money back. They sent a letter on August 3, 2010, asking for return of the money. So we did ask for it back. The Zarembas never agreed or even offered to forbear to sue. And, indeed, they sued us, which is why we have all these state law counterclaims. When did they sue you, though? They sued in 2012. When did you sue, 2012? Thereabouts. It was years after 2010. But there was never a discussion between the parties of. So was failure to sue sufficient consideration? Is there any case on that, one way or the other? Frank, this is the very first time that argument has been made in this case. And I would regard that it's been waived at this point. This was never an argument made to Judge Maloney at any point. And so I don't know offhand what the case law might say there. But there's no evidence that the parties talked about we will, that the Zarembas would forbear suing for. You said they put no evidence in the record below of consideration via failure to sue. No one testified to it. There's nothing there. That's right. What about the Fitzgerald case that your opponent just cited? I find Fitzgerald a somewhat opaque opinion. I think the proper reading of that case is that there are certain types of waivers which don't rise to a level of contract. And that included what happened in Fitzgerald, which the court there regarded as an election of remedies case. Because in Fitzgerald, a house was being built. The couple it was being built for were unhappy. They sued to rescind the contract. And the builder said, no, no, don't do that. Just wait until it's built. And if you don't like it then, you don't have to take it. And I think the Court of Appeals' thinking was is that when he said that, he was electing the remedy of waiting until the house was built to demand performance by the other side and was forbearing their obligation to keep paying him money, which was what his breach of contract suit against them was about. So that's an election of remedies case. And what the Fitzgerald court said is election of remedies, waiver in the nature of an election doesn't require consideration. Waiver which rises to the level of a contract does. And as we said in our brief, we think Babcock very clearly says waiver of a substantial right is a matter of contract and therefore, it doesn't say therefore, but and is and requires consideration. And remind me what year Babcock was decided. I believe it was in 61. Okay. So that's a long time ago. Yeah. Has the Michigan Court of Appeals or the Michigan Supreme Court indicated that Babcock is still good law? The Michigan Court of Appeals routinely cite Babcock in the specific context of release of a legal right or a legal claim. And they cite Babcock for the proposition that releases must be supported by consideration. And we think that's essentially what's happened here. So notwithstanding the fact that Michigan's in the minority, Michigan has continued to be a minority. Michigan still cites Babcock. Absolutely, Your Honor. Does the pattern cite Babcock? Yes. The pattern cites Babcock and Fitzgerald. Going to the antitrust claims, very briefly. In July 15th, again, the question on the antitrust claims is did they provide evidence that excluded the possibility of independent conduct? And I want to focus on July 15th. First, it was undisputed in the record that Chesapeake did not actually stop leasing on July 15th. The record indicated that on July 15th, Chesapeake heard from the market. They heard rumors from the field. They were reading message boards that Encana had stopped leasing. There are internal Chesapeake emails on July 15th and 16th where the CEO of Chesapeake says, this makes me nervous. Should we be doing the same thing? Why don't we ask Encana why they did what they did? And they did ask Encana why they did what they did. And I want to stop there for a second because that by itself fundamentally undermines the Zaremba's theory that the July 15 decision was a result of collusion. Chesapeake had no idea that Encana was going to stop leasing before Encana did it. Chesapeake had no idea why Encana was stopping leasing. That is opposite to their theory of collusion. The record is also undisputed that Chesapeake didn't stop leasing until July 24th and they did it because they got a poor well result, which caused them to- When did you get the well results? They say you got none before you rescinded. Chesapeake got their well results on July 24th. Encana's second- Sorry. On July 24th? Chesapeake did. Chesapeake got it and then they stopped leasing. On July 24th. Same day. Yeah. And when did Encana? Encana's second well results did not come in until- So Encana- And we have never said that Encana's July 15 decision was based on new well results that Encana had received. That's not what happened. What about this board meeting? So what the letter- the letter that he was referring to that John Schaap of Encana sent to this room was on July 15th said, we're not going to be able to go forward with the deal because the board won't approve the transaction. I forget the exact language, but there's a reference to the fact that this was subject to board approval and the board won't provide it. There was no reference to we had a board meeting and the board said, no, that's their spin on that record. And what the record evidence showed is that what happened on July 15th is that the Encana executive team, which is kind of the management layer between the board above and the New Ventures team beneath, which are the team really dealing with Michigan, the executive team in early July began to have questions about whether they were really following the right strategy in Michigan. And elsewhere. Why, if you didn't have the well results, would you rescind the contract in essence? Because Encana determined that they had already acquired a substantial  And before they spent additional money on leasing, they wanted to drill a second well. The July 15th decision was not just let's stop leasing. The July 15th decision was let's pause leasing. Let's drill a new well to get a better handle on the commercial viability of this play. Let's sell a significant portion of our acreage in the southern portion of the play because we've already determined that we don't think that's commercially viable or at least worth holding on to. And let's reassess before the October auction. It was a step back by Encana management to just pause until they could get the well results. Why cancel in effect this particular contract? Because they wanted to. As opposed to pausing it and waiting to see what happened and then canceling. They backed out of all of their pending deals. And I think the thinking was let's not engage in any further leasing with anyone. It wasn't just the Zaremba's until we've got a better handle on how valuable this acreage actually is. And it was undisputed that they didn't discuss any of this with Chesapeake. What about the fact that Jacobson continued to take the fifth? I don't think that can be attributed to Encana. He was a Chesapeake employee, not an Encana employee. And so I think it has, I think it's a matter of law. That can't be a true. That could only be attributed sometimes to his employer. Why couldn't we use it as evidence? I agree you can't attribute it to Encana. But why couldn't it be further evidence of, in essence, a conspiracy for lack of a better word? As I think your Honor was indicating, the cases that discuss the probative value of Fifth Amendment invocations in this context say it's only even possible when there's corroborating evidence of the conspiracy. Sure. But their argument is there is corroborating evidence through all of these other things. In other words, the mosaic of evidence, when put together, gives you corroborating evidence. And that's simply not true, that there is the corroborating evidence. But moreover, Shopp testified about the same conversation. But the question is whether it gets to the jury or not. Not balancing it all, how would we decide? I don't think the jury could reasonably infer. And I certainly don't think that that inference, standing by itself, could infer that, yes, there is an agreement between these two companies when there is testimony about what was actually said in those phone calls, and there's no corroborating testimony of an actual agreement. Again, the standard here is not just is there a scintilla of evidence to support the conspiracy. It's have they excluded the possibility of independent behavior. And I can't think of any inference the jury could fairly draw from the fact that one half of that conversation did not revoke the privilege that would get them past that standard. Thank you. As you said, you read the entire file, all of the evidence. Don't just parse out one little date and say we can twist this one thing that way and take it out of it. Looking at everything, there is overwhelming evidence that tended to exclude. Notice when he got up there, he said it had to exclude independent. That's the same thing that Judge Maloney misstated. It's tending to exclude. Here's a bunch of actions that are clearly not independent. We appear to have agreed. Make it look, quote, competitive, not sliced and diced. This is Chesapeake land. How could it be Chesapeake land if there wasn't an agreement? That's the only way it can be Chesapeake land. We're not going to bid at Chesapeake land because there's an agreement. You have an AMI. Let's smoke a peace pipe to stop bidding each other up. That is not independent. They planned it, they divided it, and they acted exactly like they said, exactly like they said. To argue about did they stop leasing, first of all, they dropped the prices 50%. The second that agreement, you know, the second they shot Soremba, they dropped the prices 50%. And they did keep leasing. You just got up there and said Chesapeake stopped. That's a lie. Chesapeake bought at the October auction. They both bought at the October auction, even after the well result came out. They both did. And how did they buy? Chesapeake bought in the land that was assigned to Chesapeake, and Encana bought in the land that was assigned to Encana under the agreement. Why did that just happen? The May auction, they both bid on every single piece of property. In October, the world changed, separate properties. How could that have happened if there wasn't an agreement? Dr. Knieper said it doesn't make any sense. They bid against each other, and every bid in that May was competitive. Remind me, was the Soremba's property put up for auction in October? I'm sorry, I didn't hear the question. Was the Soremba's property put up for auction? No, it's a state property that's put up, but the Soremba's property is contiguous to the state property. It's all in the same Collinswood play. So it's a state property that's being put up for sale, but when property you can buy for $50 an acre from the state, why would you pay the Soremba's $3,000 an acre for property that's contiguous? You wouldn't. And the only people buying are Chesapeake and Encana. And yet, while they competed against each other every time in May, they never competed. Even though they would make it look competitive, not sliced and diced, the fact that they never competed is, again, as Judge Moore found in the carpet case. These facts show because it actually happened as they planned it. The person was murdered the same way they planned it, and they're saying they didn't do it? Because they have cover-up emails saying, oh, we didn't know it. Well, of course you're going to have cover-up emails. You're doing something illegal. They take the Fifth Amendment. The same people who put the cover-up emails in Chesapeake, both still take the Fifth Amendment today. Well, Aubrey McClendon killed himself, so I guess he didn't take the Fifth Amendment. He won't, but the other both of them still are taking the Fifth Amendment. Why? Because they're covering it up. Their attorney says don't put it in writing. The fact that there's no writing is not shocking when their attorney says don't put it in writing. That's, again, a cover-up. Make it look competitive. They covered it up. And that the guilty was smart enough to write an excuse on a piece of paper, that we didn't know, we didn't do it? That doesn't mean they're innocent. The jury can still say, you know what? You're lying when you said you didn't do it. The only thing you have to believe is that what they planned is what they did. Thank you very much for your time. I appreciate it. Thank you. Thank you both for your argument. The case will be submitted. Would the clerk call the next case, please?